We're going to go on to case number two, Appeal 2218-22, and the case is Deborah Johnson v. Edward Orton, Jr. Ceramic Foundation. Mr. Frank. Hello, Mr. Franklin. Hello. Good morning. I'm ready when you are. Oh, we're ready. I think we're ready. Good morning, Your Honors. Good morning, Judge Roebner. May it please the Court. There are two independently sufficient grounds for reversal here, and if I may, I'd like to start with what I think is the more straightforward basis for reversal. But before you do, before you do, and I apologize, but I think this is important. Well, it is for me. The District Court, in its denial of reconsideration, held that you've waived any argument. That before September of 1981, I guess, Orton knew or should have known that the vermiculite it was using as packing material was unreasonably dangerous, and that you also waived any argument that Orton made purchases of vermiculite after that point and used the material without providing a warning, and you did not challenge those holdings in your brief. So should those holdings be dispositive here? No, Your Honor. If I could make just three quick points about this forfeiture argument. First of all, if you read the reconsideration order, which is at page two to four of the supplemental appendix, what you'll see is that the District Court is actually addressing a narrow issue there, which is whether we were able to argue that Orton received the MSDS earlier than September of 1981. We're not disputing that. We accept that that was the date when the MSDS was received. Now, the second point I'd make is that Orton tries to go much further and argue, as you say, that we forfeited the entire issue of actual knowledge pre-1981 by not objecting certain paragraphs in their statement of material facts, but that's just not the case. The District Court did not find forfeiture on that broader issue, and nor could it. Paragraph 22, which is the paragraph they focus on, it states an ultimate legal conclusion. It says, you know, Orton neither knew nor should have known, and that's an issue that we certainly did strenuously contest all the way through in our opposition summary judgment. I mean, you can't read our opposition to summary judgment and come away thinking that we were conceiving the issue of Orton's knowledge, particularly given that the District Court- But can I just say, I mean, looking at these responses to paragraph 20 and paragraph 22, I was struck by their non-responsiveness, really, to the assertions of fact. So 22 is about whether Orton knew or had reason to suspect that the vermiculite came from Libby or might have contained asbestos, and the response wanders on about Orton being a trust established at a certain time and the purpose of Orton and when he starts selling it and all this. It's just not a clean response. It doesn't even say this calls for a legal conclusion. It doesn't say anything too useful, and so I understand why the District Court read it as the Court did. Well, the District Court read it as a concession with respect to the date of receipt of the MSDS, but I will grant you that it's not necessarily the cleanest way of responding to a- No, it's not at all clear. I mean, you actually have to be a mind reader, I think, to read it this way. But at base, the issue of forfeiture is the question of whether, in substance, we joined issue on those questions, and we certainly did. I mean, pages 6 to 7, 12, 13 of our Opposition to Summary Judgment, it's all about- Was that too late? I mean, you do have to have these local Rule 56.1 documents properly prepared. Well, I will note that the District Court, in its discretion, excused strict compliance with 56.1. This is footnote 2 at page 5 of the blue appendix. So I think it's clear that we joined issue on that question. And I would also note that Orton doesn't even claim that we forfeited the issue of constructive knowledge, what Orton should have known, nor did we forfeit the issue that I was going to turn to at the top, which is the broader basis for legal duty here. Yeah, I don't know that I agree with that. I mean, Orton seems to say, you know, what burden are you saying that the state law places on somebody who's shipping, you know, whether it's these little, you know, these little things, these become an expert in packaging engineering? Well, yes. I mean, under Illinois law, the product for which a manufacturer is legally responsible includes the material with which it's packaged. This is black letter law in the statement. It's been adopted in Illinois court. So when Orton- Has it been adopted with respect to negligence actions as opposed to product liability actions? It has. The cases that we cite are all cases that involve negligence claims, negligence failure or duty to warn claims like the one that we have here. So the Lewis case was both strict liability and negligence. Lewis is your best case? Lewis is our best Illinois case. We've got other cases. We've got Supreme Court cases. And it's funny though that the restatement section on negligence doesn't mention this point. It's only mentioned in the section on product liability. Why would that be? Well, I take that point, but I think that the broader idea here is that when a manufacturer makes a decision to package its product, as Orton did here, integrally with this material, I mean, it's throwing vermiculite into the box loose. It's not even separately enclosed, right? So that Mr. Johnson has to reach in and, you know, work through it with his fingers, with his hands to get these really small cones out, right? When it makes that decision, it takes on a legal duty to ensure that that material is not unreasonably dangerous. And there's no reason why that's limited to strict liability causes. I was rather impressed with the lack of cases nationally on that point as to whether packaging is included in the product, either in negligence or in strict liability. Can you account for that at all? I actually think there are plenty of cases out there that speak to this in practice. I mean, if you think about, you know, if McDonald's were to wrap its hamburgers in, you know, paper that was carcinogenic, it would be no defense for Well, that's not the point. The district court here made the same mistake. The district court said, well, you know, Orton is not in the vermiculite business and therefore can't be treated as a manufacturer. Arguably, the district court engaged in soundbite research is what it did. It took up the language in the earlier cases that, you know, we're only responsible for the knowledge in the industry. The industry is the industry that manufactures an item and packages it. I would go further, actually, Judge Ripple, and say that what the Illinois cases say is that when you're dealing with a manufacturer and the product for which that manufacturer is responsible, okay, the manufacturer is held to have the knowledge of an expert. The language in the Illinois cases, which comes again from the restatement, is the present state of human But what definition would you propose to distinguish, let's say, a supplier or a user of a product from the manufacturer? I mean, you are essentially, it seems to me, imposing strict liability on someone like Orton because it requires the foundation to have knowledge, even though it isn't involved in the mining or the production of the vermiculite. And even though, as a member of the ceramic industry, there wouldn't be, I mean, what reason would he have to know of the risk? What's your definition here? What? So a couple of points on that, Judge Roepner. First, we're not imposing a strict liability standard. So strict liability, of course, is the default. And so in a strict liability case, it wouldn't matter whether there was knowledge in the industry or in general, right? The liability would simply follow from the sale. That's not the case here. That's not the way Illinois law works. In Illinois, there is a knowledge requirement. The knowledge requirement is actually the same in a duty to warn case, regardless of whether it's strict liability or negligence. But as far as definitions go, I mean, where the district court went wrong here is by equating Orton with what it called a seller, which is a bit of a term of art in the restatement. The idea of a seller is a conduit, you know, someone like Amazon or a broker, right, that is simply a pass-through, right? But that's not the case here, right? It's not the case that Grace was using Orton as a conduit for its vermiculite. Rather, Orton was manufacturing a product, right, and chose to package it with this vermiculite, which brought benefits to Orton. But you'd make the same argument, would you not, for any component part, you know, somebody who is buying batteries to put in a product is both purchasing the batteries, and then because it's now a component part, it's being passed along to the somebody else. So you're, in a sense, saying the vermiculite is a component part as packaging of these little cones. In essence, yes. I mean, it's... Which is why, I mean, to get back to Judge Ripple's point, if it's a component part, you would think that there'd be cases all over the place about a manufacturer's duty to examine latent risks in component parts. There are plenty of cases about that, you know, car manufacturers with respect to the tires that they're putting on you. They're buying the tire from Kumho, they're putting it on their car, they're still responsible, and that's not limited either. But that's an integral part of the car, the tires. How is packing material an integral part of, you know, the product? Well, I see the factual distinction that you're making, Judge Rovner. I'm not sure that it matters. I mean, first thing I would say is, it's pretty integral here, right? The vermiculite is right there in the box, it's loose, it is being used for the benefit of Orton because it stops the cones from breaking. But it's also not a distinction that I think ought to make a difference here. I mean, if we go back to tort first principles, right? Orton is still the cheapest cost avoider here, it's in the best position to know what the properties of vermiculite are, and it's in the best position to formulate a warning. Certainly Mr. Johnson is not in the position to know what the harmful properties of this material might be. So Mr. Franklin, before you sit down, would you please explain to me why, when this judgment became a dismissal with prejudice on February 1st, 2022, that didn't trigger the time for taking an appeal? It triggered a time that it became appealable. This is all from the Otis decision, which was of course an end-back decision. I'm well familiar with Otis. Right. I figured you would be. So in the Otis decision, the court says that in a comparable context, right, where you had dismissal with leave to reinstate, that when that date arrives, when that sort of conditional moment ripens, that then becomes an appealable final decision. And then the court cites Indra Lunis and Malice and other Supreme Court decisions for the proposition that it nonetheless doesn't start the 30-day jurisdictional period for an appeal. So it's not a final judgment within the meaning of 2020. Do you think that the district court had 149 days to enter some sort of final judgment? Of course, as amended under Rule 4, the 150-day outer limit exists, but this Rule 58 judgment comes in well before that. Yes. And we asked for it. You did ask for it, yeah. But I'm just concerned in looking at the law about dismissals based on the stipulation here, but then substitutes its own order saying, I'm going to dismiss without prejudice until the 31st of January. On February 1, it turns into dismissal with prejudice. Civil case terminated, mailed notice. And so we know that the Northern District of Illinois may not be the most scrupulous about the 58 judgments, but that's my only jurisdictional concern. I'm not worried about earlier dates, but February 1 does concern me a bit. So happy to speak to that. I'm going to throw myself on the mercy of Judge Robner to get some time for rebuttal, though, because I— Who is more merciful than the group you see before you? I can't think of a more merciful group. So the February 1 date does stem, as you suggest, from what was in the order on December 16. And I think it sounds like we're in agreement that the December 16 order doesn't comply— Personally, I'm not that worried about it. Doesn't comply with Rule 58. Right. So I would just go back again to the reasoning of Otis, right? So the court can say this ripens into a dismissal with prejudice on a certain date, and it may do that such that the case becomes appealable. But Otis is pretty foursquare on that. That order doesn't somehow then transform itself into a final judgment. Is that right? So if somebody had filed a notice of appeal in this case on February 3, should this court have dismissed that appeal as premature? Well, to the extent that February 1 piggybacks on the order of December 16, we think there are satisfying Rule 58. Right. So I think it would be premature. But assuming that the December 16 order were not flawed in that way, I think certainly I would urge, would be appellant to file a protective notice of appeal as of that date. And whether it could then be appealable within the meaning of Otis is sort of beside the point because we ended up on April 6, getting the final judgment in this case, within the 150 days. Okay. Okay. Thank you. Anything else? Judge Rickle, Judge Wood, anything? No. All right. Then Mr. Sask. Thank you, Your Honor. Ben Sasay for Appellee Edward Orton Junior Ceramic Foundation. May it please the court. I'd like to make two points. First, to pick up, Your Honor, where you left off, Judge Wood, I do believe the time to appeal began to run as of February 1st. I think Otis didn't overrule the statement in Harris that said that a springing judgment can satisfy Rule 58. And here, this is not like some sort of memorandum opinion or other order that contains a lot of legal reasoning. It clearly terminated the case and it was over, our view is, as of that in cases in which Form 450 is not used and no document clearly states it is a final judgment, we might have to consider whether another entry nevertheless, you know, met the requirements of a final judgment. But here, where the district court, in fact, entered a final judgment using Form 450 that we haven't identified as the preferred vehicle for entering a final judgment, why should we even look at prior entries that weren't so characterized by the district court? Well, I think you look at it, Your Honor, because the judgment form didn't match up in April, didn't match up with the actual judgment entered in February. I mean, we're not talking about two separate judgments. The judgment in February terminated the case as to the last two remaining parties. Well, actually, I think what you, I don't want to call it a judgment. There's a minute order entered in December that says something's going to happen on February 1st, and there's no judgment entered. There is no separate order even on that date. And so the question is, does that somehow disempower the court from filing a proper Rule 58 final judgment using the standard Form 450? I think, in fact, had the backup 150-day process been triggered, there would have been a long time to file, or we would have deemed it a final judgment for a much longer time than happened here. So what I'm worried about is, under your view, we seem to have a very complicated question about appellate jurisdiction, whereas the whole point of the Rule 58A separate, simple, final order requirement is, let's make this easy. Let's look. We'll see the date the Rule 58 judgment is and on we go, whereas in your case, I mean, we're going to be pouring through dockets trying to decipher what district courts mean. I mean, I don't think it's difficult here, I guess, you know, my one small quibble, Judge Wood, is I don't think it's difficult here to determine what the district court meant, because it said it was going to be a dismissal of prejudice as of February 1st, and the entry itself says civil case terminated, and it's signed. So I think here the meaning is pretty clear, and the standard you have for when you're going to treat something, as a judgment, I think all those boxes are satisfied here, and I think that addresses your concern. But I also don't want to spend all my time on this one issue, and I take the point, and if you want to reach the merits of the appeal, I'm happy to address the merits of the appeal. Okay, and from my point of view, unless my colleagues have some questions. I agree. We would appreciate your going into your merits argument, and thank you. Thank you, Your Honor, and so on the merits, I guess, you know, the first thing is I would like to go back and address the point on the paragraph 22 of the Joint Statement. Yeah, the forfeiture issue. Thank you, Your Honor, and the forfeiture, I think, here is pretty clear. The district court said at page three of our appendix that it treated those facts as admitted, and that any objection to those facts were waived, and as the colloquy before I stood up the facts, their response was non-responsive to that point on paragraph 22, and so I think the issue of actual knowledge that Wharton may have had prior to December, I'm sorry, September 1981 is completely off the table. Now, as to this other argument they've raised, I think what they're doing is taking sound bites from cases, and they're confusing rather than explaining the talk about is you have a duty to make a safe product. They want to talk about you're an expert in the field. Well, expert in the field begs the question, first of all, of what field, and when you're trying to talk about a safe product, what they're really doing is they're short-circuiting the failure-to-warrant analysis. The failure-to-warrant analysis talks about is there some propensity of the product that may be harmful, and then secondly, does the manufacturer know or should they have known about that propensity in the product, and I don't think packing material is part of the product, but be that as it may, the Illinois Supreme Court in Whittle and the Court of Appeal in McKinney make very clear that the should-have-known analysis turns on what the industry knew, and here, as a matter of fact, there is no dispute that Wharton's industry is ceramics, and so the issue before the court is whether the ceramics industry knew, and what's also important when you look at Whittle is how that analysis works. Two more steps that I feel, Your Honor, are important. The first step is it's a reasonable objective person standard, so the stuff in their brief about, well, you know, Wharton is close to Ohio State University Library, and in theory, they could have walked across the street. That doesn't work. I take that point, but here's what, you know, a hypothetical that bothers me. Suppose a company is manufacturing a product that is a highly flammable product, and so in the old days, the bad old days, I would say, they package the product with an asbestos-containing material because asbestos, for all its flaws about lots of other things, is a very effective fire-protective substance, and so the customers of that company are opening the box, and here's the product they bought, and here's all this asbestos. Now, are you saying that that company is not responsible for keeping itself informed about the qualities of the fire-retardant material it's packaging something with? I'm saying the company has held to the standard of what the industry knew at the time of sale is what I'm saying, Your Honor, and so there it would depend on, you haven't given me any facts as to when the product was packaged, how that relates to when it became known that asbestos was hazardous. Well, they're happy to say, I mean, they think the industry, they actually think the public, you know, because of all these publications that were around and was aware that vermiculite sourced from the Libby mine as opposed to vermiculite sourced from some other places happened to be so close to these veins of asbestos-containing material, all these different types of asbestos, that it was contaminated and dangerous. I agree, that's their theory. I just don't think that, I think they overstate the articles, and I'd encourage the Court to go back and look at them more closely. I mean, you mentioned the vein, right, Your Honor, and so that appears at appendix, blue appendix, page 20, and so, oh no, 19, and so what I'd, you know, what I encourage you to do, if you look through the rest of that page, what you'll see is they don't mind that the mines were not being veined, right, and in fact, the dikes, as they call them, were taken out and trucked away as waste material, and so it's asking an awful lot for a ceramics industry to infer from that that, well, gee, you know, maybe the waste material wasn't trucked away completely, and maybe there's some sort of contamination. Nothing in there says that any of the vermiculite was contaminated as of 1940, and that's really the only, to be fair, the two articles they attached to their appendix, Your Honor, are the only articles that even arguably would be within our industry, right? The other stuff that is cited below and that they refer to in their brief relates to, you know, geological surveys and things like that, and there's absolutely no foundation that anybody in the ceramics industry would know about geological survey bulletins, so I think what you see when you look through those two articles is no one identified, no one identified at the time these products were being sold. What about Mr. Franck's testimony that there were discussions in the ceramics industry about the dangers from asbestos as early as 1970? He says he found out by word of mouth, that's kind of vague, but he himself, you know, was a, you know, major player, and so they discussed this, you know, why doesn't it seem, why isn't this some evidence that the Orton people were concerned about asbestos contamination of the vermiculite? Well, I mean, a couple points there. One, that testimony wasn't cited below. Two, we're not dealing with what Orton knew. But the court, as was pointed out to us, said that it was considering the evidence in the record. I mean, I think in fairness, what the court said was it was considering what the party cited in their brief, and it's a leap beyond that to say that it was also trolling through the record to find stuff that wasn't cited in the brief, and so my point is that was never cited below by them, and so I think that goes beyond even if you're, what the district court would have said, and then I guess another point on top of that is, you know, all that that it was contaminated with asbestos, or that they believed there was a risk of harm with it, they said they didn't know, all right? And so that's the second point with that piece of testimony, and, you know, I think... So is this deliberate, you know, sticking your head, I mean, asbestos, you know, as of 1970 was understood to be a dangerous product. But, Your Honor, vermiculite was not understood by 1970 to be a dangerous product. In fact, vermiculite was not understood to be a dangerous... The first report suggesting there might have been a problem about vermiculite didn't come out until 1982. The, as you see from paragraph 9 of the affidavit of Finley, which we appended to our brief, vermiculite was not understood to be a problem until 1991, and when you're talking about, you know, what we were doing, the minute we got the MSDS, the fact of the matter is we transitioned to another source. So, and, you know, it's not like... Didn't you? Not after we got the MSDS. No, Your Honor. When we got the MSDS, and remember, we're not talking about, you know, we keep... Your hypotheticals use asbestos, and I'm answering them and not fighting the hypothetical, but I think an important distinction here is it's not like this product was obviously contaminated and ridden with asbestos, right? When you got the MSDS, what you saw is it contained less than one tenth of one percent. Trace amounts, I recognize that, yeah. Trace amounts. So, you know, this is not the kind of product that everybody should have known, this is an asbestos product, right? It went through an exfoliation process. Their brief tried to discount what the exfoliation meant. I guess I'd encourage you, you know, when you look at page 19 of the appendix, follow on to page 20, you'll see a big room with a huge machine and several different chambers that it goes through. It gets heated to over 2,000 degrees to get exfoliated. I don't know why somebody in the ceramics industry that isn't doing this stuff every day would assume, even if there were trace amounts that might have gotten in from one of those dykes, although the dykes were shipped out separately, that that whole process, at the end of that process, you'd get a product that was contaminated with asbestos. So here, my point is they didn't lay a foundation that established that Orton, that the industry knew, and they conceded in their statement of facts that Orton didn't know. And if Orton didn't know, and the industry didn't know, there's no duty to warrant. And the only theory that they pursued here was a failure to warrant theory, and because there is no duty to warrant, the claim fails as a matter of law, and the district court's judgment should be affirmed. Any further questions? Nope, not from this quarter. Thank you, your honors. Thank you. Okay. Thank you, Mr. Franklin. Mr. Franklin, may I ask you something, please? Yes. How far would you go with all of this? In other words, what if I was a member of, what is that sell them, and other people buy them through the internet? And if I use vermiculite as my packing material, would you call me into court? I think there would be a closer question there about whether you would count as a manufacturer. There's no doubt that Orton counts as a manufacturer here, though. And I think that's the point. When my friend on the other side says, well, Orton's industry was ceramics, I just think that in light of the governing law here, that's kind of a category error, right? They are a manufacturer, and the packing material that they're throwing into their boxes is therefore treated as part of their product for purposes of a failure to warn claim, right? So, you know, the language in the case law is quite clear. My friend references the Woodhill case from the Illinois Supreme Court. So what the Woodhill case says is that either in strict liability or in negligence, the inquiry becomes whether the manufacturer, because of the present state of human knowledge, so that's not limited to the knowledge within a particular industry, knew or should have known of the danger presented by the product. And at the very least, it raises a duty to inquire, right? But that what you just said would include me, right? Well, if you are a manufacturer, then you would be helping. Well, I'm at home manufacturing. I am manufacturing these doodads or whatever they sell. I think that would be a closer question, but in concept, it's no different. You know, that's what we have here. It's not a question of whether the ceramics industry was on notice at a particular moment in time. It's a question about the legal implications of Horton's choice to pack its material with this stuff without asking a single question until 1981. For 18 years, it was using this material with a short break and never even asked Grace, what do you know about the potential harmful properties of this vermiculite? That's a breach of duty under Illinois law. So every manufacturer has an obligation to ask the people who supply packing material for any and all known problems? Well, I think their suppliers or the producer would be the natural place to go to acquire the knowledge that the law charges them with having. Certainly, Mr. Johnson is not in the position to acquire that knowledge. And that's what the Illinois cases speak about. They're talking about an asymmetry of information, right, between the defendant and the plaintiff that gives rise to a duty to warn. Briefly on the forfeiture issue, I would just point the court to page four of the red appendix. When the district court is summarizing its analysis here in the middle of that page, it says this court did not err in relying on paragraphs 20 and 22 of Horton's statement of facts in finding that Horton received the MSDS no earlier than 1981. So that's the issue that the district court was limiting itself to on forfeiture. And you see the same thing at page two of that document in the sort of intro to that discussion. So it's not a broader statement about forfeiture with respect to actual knowledge in total, nor could it be, because of course the district court understood that the issue was joined on that. Very briefly, Mr. Sasse says that Horton, the minute that they got the MSDS, stopped using vermiculite from Grace. That's not true. In the record there were two more shipments later on in 1981. And of course there's a long shelf life, so it's anyone's guess how long that material would remain usable by people like Mr. Johnson with no subsequent warning from Horton at any point in time. The court has no further questions. Thank you. Thank you very much. Thanks to both Mr. Franklin and Mr. Sasse, and the case will be taken under under advisement. We're good. The court's going to take a 10 minute break.